**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 31, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MICHAEL J. LEWIS,

        Plaintiff-Appellant,

v.

        No. 05-3383

CIRCUIT CITY STORES, INC.,

        Defendant-Appellee.

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 05-CV-4001-JAR)**

---

David O. Alegria of McCullough, Wareheim & LaBunker, P.A., Topeka, Kansas, for Plaintiff-Appellant.

Stephen Robert Clark (Kevin J. Breer with him on the brief), of Polsinelli Shalton Welte Suelthaus, PC, St. Louis, Missouri, for Defendant-Appellee.

---

Before **KELLY**, **EBEL**, and **GORSUCH**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

      Plaintiff-Appellant Michael Lewis brought suit against his former

employer, Defendant-Appellee Circuit City, for wrongful termination, based on

alleged retaliation against Lewis for seeking workers' compensation benefits, a tort recognized by Kansas. However, Lewis has already arbitrated a claim of retaliatory discharge against Circuit City, pursuant to an arbitration agreement he signed with his employment application, and lost on the merits of that claim. Yet Lewis now brings the very same claim of retaliatory discharge in court based on the same incident and harm alleged in the arbitration proceeding against Circuit City. Looking to well-settled law, we conclude that Lewis's claim is barred by claim preclusion. We also hold that Lewis has waived his argument that the arbitration agreement is invalid under contract law, because he proceeded through arbitration without objecting to the agreement's enforceability. In addition, we conclude that Lewis's argument that the arbitration decision violates public policy has no merit. Finally, we conclude that sanctions are not appropriate in this case. Accordingly, we AFFIRM the district court's dismissal of Lewis's suit on summary judgment and DENY Circuit City's motion for sanctions.

## I. BACKGROUND

Lewis's Employment with Circuit City

Michael Lewis became a full-time employee of Circuit City in September 1996 as a "roadshop manager." In February 1997, he injured his knee while installing an automobile alarm, and sought medical treatment through a workers' compensation claim. He states that over the years he has "continued to have

problems" with his knee and, at various times, notified Circuit City of those problems. Lewis informed his supervisor in writing in November 2002 that he still had pain in his knee and requested to see a medical specialist, but allegedly did not receive a response.

Circuit City terminated Lewis on January 6, 2003. The parties dispute the reason for Lewis's termination. Lewis claims that after he requested additional medical treatment in November 2002, his supervisor's attitude toward Lewis "became hostile and retaliatory," and Lewis was disciplined and suspended. On those facts, Lewis claims that Circuit City wrongfully terminated him in retaliation for filing a worker's compensation claim.

Circuit City states that it terminated Lewis because he violated the company's weapons policy, a violation brought to the company's attention by employee Mike Guerrero.[1] In early December 2002, Lewis had a "confrontation" with Guerrero that resulted in Guerrero "walking off the job." Guerrero then called an employer-provided telephone hotline to complain about Lewis. His complaint included allegations that Lewis had brought a gun to work and had cleaned it at the work counter. When questioned, Lewis admitted that he had brought a "pistol grip and slide" to work to repair it, and that he worked on it out

---

[1] The following facts are adopted from the arbitrator's decision and are undisputed.

of view of any customers. He said these were only "parts" of a handgun, not an operable handgun, and therefore the weapons policy did not apply. However, four members of Circuit City's management reviewed this information, decided that it was a violation of the weapons policy, and concluded that termination was warranted.[2]

The Arbitration Agreement

When Lewis applied for employment in 1996, his application included a Dispute Resolution Agreement (the "arbitration agreement") in which he agreed to settle any claims arising out of his application process or any future employment with Circuit City "exclusively by final and binding arbitration before a neutral Arbitrator." The agreement covered any claims

> arising under federal, state or local statutory or common law . . . includ[ing], but not limited to . . . Title VII of the Civil Rights Act of 1964, as amended, . . . state discrimination statutes, state statutes and/or common law regulating employment termination, the law of contract or

---

[2] Lewis also alleged during arbitration that Circuit City "made a deal" with this Guerrero, who is Hispanic, to re-employ him after firing Lewis, arguing that this constituted illegal preferential treatment by race under Title VII of the Civil Rights Act. Circuit City said it rehired Guerrero because his complaint had been substantiated, and because he had been employed only a short period of time before the events at issue unfolded, and Circuit City wished to give him an opportunity to "complete his training or demonstrate his abilities."

Although Lewis brought a Title VII claim in arbitration, this factual dispute is of no import. Lewis did not bring a Title VII claim in his complaint in court. His claim was only for the tort of retaliatory discharge as recognized by Kansas common law. See infra.

the law of tort: including, but not limited to, claims for . . . wrongful discharge . . . and intentional/ negligent infliction of emotional distress or defamation. Statutory or common law claims alleging that Circuit City retaliated or discriminated against an Associate shall be subject to arbitration.

The agreement contained a statement that signing the agreement was a condition of being considered for employment by Circuit City, and that arbitration would be conducted in accordance with the Circuit City Dispute Resolution Rules and Procedures (the "arbitration procedures"). Lewis signed this statement. He does not dispute that he received notice of the procedures. The procedures specified that although the substantive law of the state in which Lewis was employed would apply to any claims raised in arbitration, decisions and awards would be enforceable through the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, et seq., and the Uniform Arbitration Act of Virginia, Va. Code Ann. § 8:01-581.01, et seq.

Procedural History

Lewis submitted an Arbitration Request Form in April 2003, identifying his intended counsel as David Alegria. In this form, he claimed that he was fired because he had informed his supervisor "that my knee had been hurt at work and I needed medical attention." He requested that his position be "restored with back pay." This form, which he signed, stated that he agreed "to accept the decision and award of the Arbitrator as final and binding." Lewis submitted another

Arbitration Request Form in August 2003, which included more details about the nature of his complaint, made specific claims under the Kansas Act Against Discrimination, Kan. Stat. Ann. § 44-1001, et seq., and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., and made a generalized claim for retaliatory discharge under state law.[3] Lewis requested five years' worth of annual compensation (totaling $226,910), medical reimbursement, $500,000 for emotional distress, unspecified punitive damages, and attorneys fees. This request, prepared by Alegria, did not include the statement agreeing to accept the decision and award of the arbitrator.

The arbitration hearing commenced February 25, 2004, and ended February 27, 2004. Pursuant to the procedures, a single arbitrator heard the matter. While it is not clear what the full extent of discovery was, or the nature of the hearing, the record includes a set of interrogatories completed by Lewis, several references

---

[3] Lewis stated in the second Arbitration Request Form:

Under Kansas Public policy, a termination of employment for an employee's efforts to exercise statutory rights under the Kansas Workers' Compensation Act constitutes unlawful retaliation and entitles the terminated employee to actual and punitive damages. . . .

I believe that Circuit City has committed an unlawful practice . . . in retaliation for my filing of a worker's compensation claim under K.S.A. 44-501 et seq. This also constitutes a violation of Title VII of the Civil Rights Act.

to witness testimony, an acknowledgment of evidence and post-hearing briefs, and an apparently unsuccessful attempt to subpoena Guerrero for the hearing.

The arbitrator issued a decision on April 30, 2004, that addressed Lewis's Title VII and retaliatory discharge claims. Specifically with respect to retaliatory discharge, the arbitrator cited to Ortega v. IBP, Inc., 874 P.2d 1188, 1191, 1198 (Kan. 1994), which stated that Kansas courts recognize the tort in the context of worker's compensation filings and concluded that a plaintiff "must establish that claim by a preponderance of the evidence, but the evidence must be clear and convincing in nature." Noting that "[n]umerous case decisions [from state and federal Kansas courts] follow the burden-shifting requirements set forth in the United States Supreme Court decision of McDonnell Douglas Corp. v. Green[, 411 U.S. 792 (1973),] . . . for both claims of discrimination under the Civil Rights Act of 1964, and retaliatory discharge claims," the arbitrator proceeded to analyze the facts of the case and concluded that Circuit City's reason for termination was not "mere pretext" for discrimination or retaliation.[4] The arbitrator ruled that Circuit City was justified in terminating Lewis because it had interpreted the

_____

[4] McDonnell Douglas permits a Title VII plaintiff to present a prima facie case of discrimination based on circumstantial evidence, but eventually puts the onus back on the plaintiff to prove discrimination. See 411 U.S. at 804-05. In Ortega, the Kansas Supreme Court implied that the McDonnell Douglas burden-shifting approach applies in state law employment discrimination actions, but did not expressly hold that it should be invoked in tort actions for retaliatory discharge. 874 P.2d at 1197.

weapons policy in good faith. The arbitrator noted that it was possible that Circuit City's management misapplied the policy, but relied on Sanchez v. Philip Morris Inc., 992 F.2d 244, 247 (10th Cir. 1993), which states that "Title VII is not violated by the exercise of erroneous or even illogical business judgment." Although Circuit City's procedures permitted the arbitrator to shift the costs of the arbitration from Circuit City to the claimant if he should lose, the arbitrator declined to do so in Lewis's case.[5]

In December 2004, Lewis – through the same counsel he used in arbitration – filed suit against Circuit City in Kansas state court alleging "wrongful termination based upon retaliation for exercising statutory rights under the Kansas workers' compensation Act." Lewis stated that he "ha[d] exhausted his arbitration remedies," and contended that under Kansas law, "the tort of retaliatory discharge is a non-negotiable right" inappropriate for resolution by arbitration. Circuit City removed to federal court on the basis of diversity of

[5] The procedures provide that the Circuit City employee initiating an arbitration must pay a $75 fee, but can apply for a financial hardship waiver, which Lewis did. If the claimant wins, the filing fee is refunded to him, and the arbitrator may require that Circuit City pay the claimant's incidental costs. However, in the event that Circuit City prevails, the arbitrator may require the claimant to pay Circuit City's arbitration costs. The employee's share of arbitration costs is capped at the higher of $500 or 3 percent of the employee's annual salary at Circuit City, which at Lewis's asserted annual salary of $45,382 would be $1361.42.

The arbitrator is authorized to award attorney's fees "in accordance with applicable law."

citizenship and amount in controversy pursuant to 28 U.S.C. § 1332. Circuit City then filed a motion to dismiss, arguing that because Lewis agreed to final and binding arbitration, he could not seek a "second bite at the apple" on the very same claim in court. The district court converted Circuit City's motion to a motion for summary judgment, and, after the requisite briefing, granted the motion. The court decided that Lewis had not alleged any of the narrow bases permitted by the FAA for vacating or modifying an arbitration award, and that he had missed the FAA deadline for filing such a suit by several months. The court thus concluded that Lewis's suit improperly sought to relitigate a claim after a final judgment. Lewis v. Circuit City Stores, Inc., No. 05-4001-JAR (D. Kan. Sept. 7, 2005). This timely appeal followed.

## II. DISCUSSION

We have jurisdiction over this appeal as an appeal from a final decision of a district court, 28 U.S.C. § 1291, and to the extent this is an appeal from a final decision with respect to an arbitration that is subject to the FAA, we have appellate jurisdiction under 9 U.S.C. § 16(a)(3).[6]

---

[6] It is clear that the FAA applies to Lewis's arbitration agreement with Circuit City. Section 2 of the FAA validates and enforces any "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction." 9 U.S.C. § 2. Moreover, the arbitration agreement itself provided that

(continued...)

- 9 -

We review "de novo . . . the district court's grant of summary judgment, applying the same legal standard as the district court." Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1106-1107 (10th Cir. 2005). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Wolf v. Prudential Ins. Co., 50 F.3d 793, 796 (10th Cir. 1995) (quotation omitted). "When applying the de novo standard of review to the district court's grant of summary judgment, we view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Elliott Indus., 407 F.3d at 1107 (quotation

_____

[6](...continued)
enforceability of the agreement was to be governed by the FAA and the Uniform Arbitration Act of Virginia.

Lewis argues that the FAA does not apply to employment relationships or to jobs not related to interstate commerce. But the Supreme Court has determined that the FAA applies to agreements to arbitrate employment disputes; indeed, the Court specifically has done so with respect to a Circuit City arbitration agreement with a sales counselor. Circuit City Stores, Inc. v. Adams, 532 U.S. 105 (2001). The Court decided that the reference to "transaction" in Section 2 of the FAA is broad enough to apply to employment contracts, and held that the exceptions to FAA applicability at Section 1 of the Act apply only to employees who work directly in a channel of interstate commerce, such as the sea or railroad. Id. at 118. The Court so ruled without reference to a test for whether a particular employee's job was related to interstate commerce, consistent with its prior holding that Section 2's coverage of transactions "involving commerce" is co-extensive with the broad reach of the U.S. Constitution's Commerce Clause. Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 274 (1995).

- 10 -

omitted). Because Lewis was the non-moving party, we view the evidence before us in the light most favorable to him.

**A. Construction of Lewis's Complaint**

Lewis's complaint brings a claim for relief based on the tort of retaliatory discharge, and Lewis consistently represented to the district court that this was the nature of his claim. Therefore, we construe his cause of action as the common law tort of retaliation for seeking workers' compensation benefits, recognized by Kansas courts as an exception to the employment-at-will doctrine. See Coleman v. Safeway Stores, Inc., 752 P.2d 645, 648-49 (Kan. 1988) (emphasizing "the tort nature of the employee's cause of action" and "the strong public policy of Kansas underlying the Workers' Compensation Act"), disapproved of on other grounds by Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juvenile Det. Facility, 101 P.3d 1170, 1175 (Kan. 2004). We observe that although Lewis alleges he was retaliated against for "exercising his statutory rights under the Kansas workers' compensation Act," he provides no citation or argument that the Act itself provides a cause of action for retaliatory discharge.[7]

_____

[7] Lewis's complaint also refers to Title VII in its factual allegations: "Mr. Lewis had opposed discrimination which is prohibited by Title VII of the Civil Rights Act as amended by refusing to extend preferential treatment to a Hispanic employee." This lone comment regarding Title VII and discrimination without any reference to actions by Circuit City does not meet the standards of even our
(continued...)

- 11 -

Lewis's complaint does not mention the FAA or acknowledge the arbitration agreement generally. Instead, Lewis insists that under Kansas law, he has a legal right to his day in court, citing Coleman. Notably, Lewis does not argue that his complaint is intended to seek review of the arbitration decision under the limited grounds afforded by the FAA.[8] In fact, Lewis specifically conceded before the district court that "[t]he admittedly narrow and strictly limited standards of appeal of an arbitrator's decision made an appeal . . . futile." Before us, Lewis does not appeal the district court's conclusion that he did not avail himself of review under the FAA, a petition that would have been untimely anyway pursuant to the three-month deadline in 9 U.S.C. § 12. As such, we construe this action purely as one seeking to litigate a claim of retaliatory discharge under state tort law.

**B. Applicability of Claim Preclusion**

---

[7](...continued)
most basic pleading requirements to state a claim under Title VII.

[8] Section 10 of the FAA permits a district court to vacate an award where a party asserts that the arbitration award was the result of misconduct or a significant procedural irregularity. See 9 U.S.C. § 10. Section 11 permits a court to modify an award to correct a mistaken calculation or other factual error, or to change its scope if the arbitration decision reached a matter not actually submitted to arbitration. See 9 U.S.C. § 11. The Act, however, does not provide for judicial review of the merits of an arbitrator's decision.

"The doctrine of res judicata, or claim preclusion, will prevent a party from relitigating a legal claim that was or could have been the subject of a previously issued final judgment." MACTEC, Inc. v. Gorelick, 427 F.3d 821, 831 (10th Cir. 2005), cert. denied, 547 U.S. 1040 (2006). In deciding "the claim-preclusive effect of a federal diversity judgment," we generally "adopt the law that would be applied by state courts in the State in which the federal diversity court sits." Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp., 296 F.3d 982, 986 (10th Cir. 2002) (quoting Matosantos Commercial Corp. v. Applebee's Int'l, Inc., 245 F.3d 1203, 1208 (10th Cir. 2001)). The parties have not addressed the choice-of-law provisions in the arbitration agreement, specifically whether Virginia's or Kansas's doctrine of claim preclusion applies to enforcement of the arbitration award. We do not need to resolve this issue here because, under the law of either jurisdiction, Lewis's judicial claim against Circuit City seeking damages for retaliatory discharge would be barred.

There is no dispute that Lewis previously brought an action against the same party, complaining of the same wrongful discharge based on pursuit of worker's compensation benefits, which resulted in a final arbitration decision on the matter. Virginia's doctrine of claim preclusion "prevents relitigation of the same cause of action, or any part thereof which could have been litigated, between the same parties and their privies." Bill Greever Corp. v. Tazewell Nat'l

- 13 -

Bank, 504 S.E.2d 854, 856 (Va. 1998). Similarly, Kansas law prevents Lewis from proceeding with his claim anew. "The doctrine of res judicata is a bar to a second action upon the same claim, demand or cause of action." In re Estate of Reed, 693 P.2d 1156, 1160 (Kan. 1985). The fact that Lewis was ambiguous as to the legal source of his right of action for retaliatory discharge during arbitration does not undermine our conclusion that he brought the same claim then as he does now, particularly given that the arbitrator invoked Kansas law on the tort of retaliatory discharge in deciding that Lewis has not met his burden of proving retaliation.

Furthermore, courts in both jurisdictions have applied claim preclusion to litigation subsequent to final and valid arbitration awards. See, e.g., Waterfront Marine Constr., Inc. v. N. End 49ers Sandbridge Bulkhead Groups A, B and C, 468 S.E.2d 894, 902 (Va. 1996); O'Keefe v. Merrill Lynch & Co., 84 P.3d 613, 619 (Kan. Ct. App. 2004). This court also has held that the doctrine applies to arbitration decisions. See MACTEC, 427 F.3d at 831 ("As for finality, a valid and final award by arbitration generally has the same effect under the rules of res judicata as a judgment of a court.").

Lewis's judicial claim against Circuit City seeking damages for retaliatory discharge fits squarely within claim preclusion.[9] Although his arguments are vague and unstructured, he apparently seeks to avoid claim preclusion through two theories designed to undermine the finality of the arbitration decision: first, that his arbitration agreement with Circuit City was never valid under contract law; and second, that Kansas public policy prevents enforcement of the arbitration award. With regard to the first argument, we determine that he has waived it by

---

[9] Lewis argues that his retaliatory discharge tort claim is analogous to a 42 U.S.C. § 1983 or Title VII action, and contends that arbitration of such actions do not generate a claim-preclusive effect that would preclude further litigation. Indeed, the Supreme Court has held that where a city police officer files a grievance against the city pursuant to a collective bargaining agreement and it is arbitrated, claim preclusion does not apply to a subsequent § 1983 claim brought in court. McDonald v. City of W. Branch, 466 U.S. 284, 292 (1984). To the extent the Supreme Court has permitted litigation of a Title VII claim after arbitration, it has been under the same collective-bargaining context as McDonald. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 34-35 (1991) (discussing Alexander v. Gardner-Denver Co., 415 U.S. 36, 49-50 (1974)).

But the Court has since limited McDonald's rule to arbitrations of grievances regarding contractual rights in collective-bargaining agreements, noting that in a collective-bargaining context, "the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit," and hence an individual should have the opportunity to represent his or her own interests in court. Gilmer, 500 U.S. at 35 (quoting Gardner-Denver, 415 U.S. at 58 n.19). The Court also distinguished Gardner-Denver, McDonald and related cases as involving arbitration of contract-based claims, in contrast to statutory claims, because the employees had never agreed to have an arbitrator decide their individual statutory rights. Id.

In contrast, Lewis's arbitration agreement was not part of any union policy or collective-bargaining agreement. Furthermore, Lewis's arbitration agreement with Circuit City was not limited to contractual disputes, but instead Lewis broadly agreed to arbitrate any statutory or tort claims.

proceeding without objection through arbitration. With regard to the second, we conclude that controlling precedent precludes the application of the public policy exception to judicial enforcement of arbitration awards to the facts of this case.

## C. Lewis's Argument that the Arbitration Agreement is Unenforceable

Lewis argued to the district court that his arbitration agreement with Circuit City was unenforceable as a matter of basic contract law. He continues to press this argument on appeal. We conclude that Lewis waived this argument by proceeding with arbitration without placing any objection clearly on the record prior to or during the arbitration proceeding.

Section 2 of the FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has held that state contract law can therefore invalidate such agreements "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 686-87 (1996) (quotation, emphasis omitted). "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." Id. at 687.

The Supreme Court has observed that to the extent parties "forcefully object[] to the arbitrators deciding their dispute," they preserve their objection

- 16 -

even if they follow through with arbitration. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 946 (1995); accord Coady v. Ashcraft & Gerel, 223 F.3d 1, 9 n.10 (1st Cir. 2000) (finding no waiver when the party "consistently and vigorously maintained its objection to the scope of arbitration"); China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp., 334 F.3d 274, 291-92 (3d Cir. 2003) (same).

On the other hand, many courts have held that, absent an explicit statement objecting to the arbitrability of the dispute, a party cannot "await the outcome and then later argue that the arbitrator lacked authority to decide the matter." AGCO Corp. v. Anglin, 216 F.3d 589, 593 (7th Cir. 2000); see also Opals on Ice Lingerie, Designs by Bernadette, Inc. v. Bodylines Inc., 320 F.3d 362, 368 (2d Cir. 2003) ("[I]f a party participates in arbitration proceedings without making a timely objection to the submission of the dispute to arbitration, that party may be found to have waived its right to object to the arbitration."); Slaney v. Int'l. Amateur Athletic Fed'n, 244 F.3d 580, 591 (7th Cir. 2001) ("Slaney could not sit back and allow the arbitration to go forward, and only after it was all done . . . say: oh by the way, we never agreed to the arbitration clause. That is a tactic that the law of arbitration, with its commitment to speed, will not tolerate." (quotation omitted)); Fortune, Alsweet & Eldridge, Inc. v. Daniel, 724 F.2d 1355, 1357 (9th Cir. 1983) (per curiam) (holding that "a party may not submit a claim to

arbitration and then challenge the authority of the arbitrator to act after receiving an unfavorable result" because it would "frustrate th[e] policy" behind arbitration).

We have not published an opinion regarding whether a party's failure to raise a question of the enforceability of an arbitration agreement, followed by the party's participation in arbitration, effectively waives that party's right to object to arbitration.[10] However, in reviewing Supreme Court precedent and persuasive authority from other circuits, it is clear that our usual rules regarding waiver and estoppel apply to prevent a party from complaining about the enforceablity of an arbitration agreement if he already has fully participated in arbitration without any relevant objection. In particular, a rule of waiver is important to advance the goals of arbitration as an efficient method of dispute resolution for which parties may contract in advance. "It would be unreasonable and unjust to allow [a party] to challenge the legitimacy of the arbitration process, in which he had voluntarily

---

[10] We did hold, in a recent unpublished opinion, that where a party "vigorously participated in the arbitration," he may waive any objection to arbitration. Hicks v. Bank of Am., N.A., 218 Fed. Appx. 739, 746 (10th Cir. Feb. 21, 2007) (unpublished). We also have held in the reverse situation – where a party goes to trial rather than seeking to compel arbitration at the earliest opportunity – that the party waives its right to compel arbitration after an unfavorable court verdict. Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1490 (10th Cir. 1994).

participated over a period of several months . . . ." Fortune, Alsweet & Eldridge, 724 F.2d at 1357.

Lewis states that he objected to arbitration, that he "never had a choice to opt out," and that he "made it clear that he did not want to arbitrate."[11] He points to a blank dispute resolution agreement that he and his attorney allegedly refused to sign. He also states that he followed through with arbitration "to comply with defendant's demands for arbitration and to exhaust such process."

But, importantly, at oral argument, Lewis conceded that he had not expressly challenged the enforceability of the agreement during arbitration. The record here reveals only a general complaint about having to arbitrate, and is devoid of an objection to any legal aspect of the arbitration agreement or to the enforceability of the agreement generally. A party's bare statement that he does not want to arbitrate a dispute is, of course, not a legal argument or objection, but instead merely signals "buyer's remorse" that he agreed at the outset to arbitrate future disputes. Furthermore, the evidence belies Lewis's claim that he "never

---

[11] Lewis also references a letter from his attorney purporting to object to arbitration, but the letter is not in the record before this court. "Where the record is insufficient to permit review we must affirm." Scott v. Hern, 216 F.3d 897, 912 (10th Cir. 2000). In any event, Lewis does not allege that the letter objected to the validity or enforceability of the arbitration agreement under contract law, or to the arbitrability of his claims generally.

voluntarily agreed" to arbitrate his employment claims, because he twice completed and signed arbitration request forms, the second time through counsel.

Because Lewis never adequately objected in arbitration to the arbitrability of his claims or raised a question as to the validity of the arbitration agreement, he waived his opportunity to do so and is estopped from raising such issues now.[12]

## D. Lewis's Argument That Kansas Public Policy Prohibits Enforcement of the Arbitration Award

"Mindful of the strong federal policy favoring arbitration, a court may grant a motion to vacate an arbitration award only in the limited circumstances provided

---

[12] Although we do not base our decision on the merits of Lewis's theory of why the agreement was unenforceable, we observe that he has not alleged any facts or developed an argument that could support a conclusion that the arbitration agreement was invalid under contract law.

We have invalidated illusory agreements to arbitrate, holding "that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory," Dumais v. Am. Golf Corp., 299 F.3d 1216, 1219 (10th Cir. 2002), but Lewis does not explain how Circuit City's Agreement fits that pattern. Furthermore, Lewis cites no support for his theory that form contracts – i.e. contracts drafted by only one party – are per se invalid.

We have found unenforceable an arbitration agreement that imposed prohibitively high costs on claimants, since high fees may deter claimants from pursuing their statutory rights. Shankle v. B-G Maint. Mgmt. of Colo., Inc., 163 F.3d 1230, 1234-35 (10th Cir. 1999) (involving an arbitration fee estimated at $1,875 to $5,000). But Lewis does not inform us what his costs were, only that they were "thousands of dollars," and he does not distinguish between his arbitration fees and attorney's fees. Based on information in the record about Circuit City's policy of limiting an employee's arbitration costs, we estimate Lewis's costs would be capped at about $1,360.

in § 10 of the FAA, or in accordance with a few judicially created exceptions."

Bowen v. Amoco Pipeline Co., 254 F.3d 925, 932 (10th Cir. 2001) (citations

omitted).  Those "judicially created exceptions" apply to awards that violate

explicit public policy, derive from a manifest disregard of the law, or were the

result of an unfair hearing.  Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R.

Co., 119 F.3d 847, 849 (10th Cir. 1997) (citing W. R. Grace & Co. v. Local

Union 759, 461 U.S. 757, 766 (1983)).  Lewis contends that the arbitration award

violates Kansas public policy and therefore is void.[13]  We conclude that

---

[13] The other judicially created exception that Lewis might have argued applies to his appeal is the one permitting courts to set aside arbitration decisions that were the result of an unfair hearing.  Denver & Rio Grande W. R.R. Co., 119 F.3d at 849.  Lewis alleges that he subpoenaed the "individual that accused me of misconduct at work," presumably Guerrero, but the individual "refused to appear at the arbitration" and the "arbitrator did nothing to compel . . . the accuser's attendance to the arbitration."

A court may reverse an arbitration decision if the proceeding was "fundamentally" unfair.  Bowles Fin. Group, Inc. v. Stifel, Nicolaus & Co., 22 F.3d 1010, 1012 (10th Cir. 1994).  "[A] fundamentally fair hearing requires only notice, opportunity to be heard and to present relevant and material evidence and argument before the decision makers, and that the decisionmakers are not infected with bias."  Id. at 1013.  Lewis does not argue that the arbitrator denied him the right to present evidence.  Instead, a subpoenaed witness did not appear.  Lewis does not state whether he objected to the missing witness, whether he asked the arbitrators to assist him in enforcing the subpoena, or how the witness's testimony would have made a difference to the outcome of the proceeding.  Therefore, not only does Lewis fail to connect his factual allegations to a legal argument that the arbitration proceeding was unfair, but also he lacks any allegations that would support such an argument.

- 21 -

controlling precedent from the United States and Kansas Supreme Courts renders Lewis's argument meritless.

The public policy exception to enforcing arbitration awards is "rooted in the common law[] that a court may refuse to enforce contracts that violate law or public policy." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 42 (1987). The Supreme Court has "cautioned . . . that a court's refusal to enforce an arbitrator's interpretation of such contracts is limited to situations where the contract as interpreted would violate 'some explicit public policy' that is 'well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Id. at 43 (quoting W.R. Grace, 461 U.S. at 766; emphasis omitted). We have emphasized the narrow application of the public policy exception, "keeping in mind the admonition that an arbitration award is not to be lightly overturned." Seymour v. Blue Cross/Blue Shield, 988 F.2d 1020, 1024 (10th Cir. 1993). Specifically, we have observed that a party does "not establish[] a public policy violation sufficient to overturn [an] arbitrator's award" if the arbitrator's decision "does not violate a clearly expressed law." Id. at 1025. If an arbitrator could have reasonably construed the facts of the case to eliminate such a conflict with established law, then the public policy exception does not apply. Id.

Lewis argues that Kansas public policy allows him to file a retaliatory discharge tort claim independent of arbitration.[14]  However, the Kansas Supreme Court has held that where the FAA applies to an arbitration agreement, it preempts any state law that otherwise might invalidate such an agreement. Skewes v. Shearson Lehman Bros., 829 P.2d 874, 879 (Kan. 1992).

The Kansas Uniform Arbitration Act (KUAA) provides that contract provisions requiring the parties to arbitrate future disputes are enforceable, Kan. Stat. Ann. § 5-401(b), but provides an exception for "contracts between an employer and employees, or . . . any provision of a contract providing for arbitration of a claim in tort," id. § 5-401(c).  Based on this statute and state "public policy," the Kansas Supreme Court held in Coleman v. Safeway Stores, Inc., 752 P.2d 645, that a contract to arbitrate in the collective bargaining context did not preclude a labor worker from bringing an independent tort action in court for retaliatory discharge.  The Coleman court echoed the distinction the U.S. Supreme Court has drawn between direct employer-employee arbitrations and those that are led by the employee's labor union pursuant to a collective bargaining agreement, see Gilmer, 500 U.S. at 35, and concluded that "[t]he potential result of a union's emphasis on the collective good is that, in some

_____

[14] We assume arguendo that Kansas law would apply to the question Lewis presents.

- 23 -

cases, the employee may be left without a remedy for an employer's violation of state public policy." Coleman, 752 P.2d at 651-52. Lewis similarly points to Hysten v. Burlington N. Santa Fe Ry. Co., a case allowing an employee to file suit claiming retaliation after he already arbitrated the issue pursuant to a collective bargaining agreement, as support for the policy of the right to file retaliation claims independent of arbitration. 108 P.3d 437, 445 (Kan. 2004).

However, we have no doubt that when the FAA applies to an arbitration agreement, the FAA preempts conflicting state law and will enforce the agreement. "In enacting § 2 of the federal [Arbitration] Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." Southland Corp. v. Keating, 465 U.S. 1, 10 (1984). "We see nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under state law." Id. at 11; see also Perry v. Thomas, 482 U.S. 483, 490-91 (1987) (same).

The Kansas Supreme Court held as much in Skewes, 829 P.2d at 879, reiterating that the FAA preempted the state statute that otherwise would refuse to enforce arbitration of tort claims. The court distinguished Coleman as a case employing the Labor Management Relations Act rather than the FAA. See id. at 878. "The FAA requires state courts to enforce an arbitration clause despite

- 24 -

contrary state policy." Id. at 879. The court acknowledged that it had observed in Coleman that "arbitral procedures are comparatively inappropriate for the resolution of tort claims." Id. at 878. The court noted, though, that in other cases involving tort claims such as fraud and breach of fiduciary duty, the court had held that arbitration was required, and that, in any event, "[t]he United States Supreme Court has not limited the preemption by the FAA." Id. at 878-79.[15]

Both U.S. Supreme Court and Kansas Supreme Court authorities hold that the FAA preempts the limitations that Kansas law might otherwise apply to the enforceability of arbitration agreements. Lewis does not argue that his arbitration fits within the potential exception pursuant to a collective bargaining agreement or other union context. He thus cannot show "by reference to the laws and legal precedents" that enforcing his arbitration agreement with Circuit City violates "explicit public policy." Misco, 484 U.S. at 43.

## E. Circuit City's Motion for Sanctions

_____

[15] Hysten does not change the analysis. The court in Hysten found that an independent court action was warranted because remedies available in that arbitration pursuant to the Railway Labor Act were not an adequate alternative to those available through a retaliatory discharge action under Kansas tort law. 108 P.3d at 445. In contrast, Lewis's agreement is governed by the FAA, not a labor relations statute. Lewis has not alleged that the agreement or FAA deprives him of a remedy otherwise available at law.

Circuit City moved for sanctions against both Lewis and his attorney, David Alegria, in the form of attorneys' fees and costs.

Section 1927, titled "Counsel's liability for excessive costs," states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Fed. R. App. P. 38 similarly provides that "[i]f a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee." We also have "inherent powers" to "levy sanctions in response to abusive litigation practices." Roadway Express, Inc. v. Piper, 447 U.S. 752, 764-65 (1980). "At the appellate level the bringing of the appeal itself may be a sanctionable multiplication of proceedings. Consequently, in an appropriate case the court may assess the entire costs of litigation on appeal as 'excess costs' under § 1927 or as 'just damages' under Fed. R. App. P. 38." Braley v. Campbell, 832 F.2d 1504, 1513 (10th Cir. 1987) (en banc).

We have stated, though, that we do not take sanction decisions lightly. Dreiling v. Peugeot Motors of Am., Inc., 768 F.2d 1159, 1165 (10th Cir. 1985) (noting that the "power to assess costs against an attorney . . . must be strictly

construed and utilized only in instances evidencing a serious and standard disregard for the orderly process of justice"). Examples of when we have found sanctions appropriate include: when counsel repeatedly refers to facts in the record that simply are not there, Herzfeld & Stern v. Blair, 769 F.2d 645, 647 (10th Cir. 1985); when counsel does "not raise any issue at any level of review that has not already been addressed by this court or other circuits numerous times," Moulton v. Comm'r of Internal Revenue, 733 F.2d 734, 735 (10th Cir.), modified on other grounds by 744 F.2d 1448, 1448-49 (10th Cir. 1984); when an appeal is "hopeless . . . under any reasonable analysis" and "vexatious at least in part because [the] briefing obfuscated the legal issues and complicated the defendants' and the court's task of sorting them out," Braley, 832 F.2d at 1509; and when counsel "submit[s] rambling briefs that make no attempt to address the elements requisite to obtaining reversal, . . . fail[s] to explain how the lower tribunal erred or to present clear or cogent arguments for overturning the decision below, . . . [and] cit[es to] inapplicable or irrelevant authorities, or misrepresent[s] facts or law to the court." Gallegos v. Jicarilla Apache Nation, 97 Fed. Appx. 806, 813-14 (10th Cir. Nov. 28, 2003) (unpublished) (quotation, alterations omitted).

Because arbitration presents such a "narrow standard of review," Section 1927 sanctions are warranted if the arguments presented are "completely

meritless." Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C., 430 F.3d 1269, 1279 (10th Cir. 2005). In a persuasive discussion, the Eleventh Circuit recently described why the availability of sanctions may be more appropriate in an appeal involving a prior arbitration award:

> When a party who loses an arbitration award assumes a never-say-die attitude and drags the dispute through the court system without an objectively reasonable belief it will prevail, the promise of arbitration is broken. Arbitration's allure is dependent upon the arbitrator being the last decision maker in all but the most unusual cases. The more cases there are, like this one, in which the arbitrator is only the first stop along the way, the less arbitration there will be. If arbitration is to be a meaningful alternative to litigation, the parties must be able to trust that the arbitrator's decision will be honored sooner instead of later.

> Courts cannot prevent parties from trying to convert arbitration losses into court victories, but it may be that we can and should insist that if a party on the short end of an arbitration award attacks that award in court without any real legal basis for doing so, that party should pay sanctions.

B.L. Harbert Int'l, LLC v. Hercules Steel Co., 441 F.3d 905, 913 (11th Cir. 2006).

Nevertheless, we decline to award sanctions in this case against either Lewis or his counsel, Mr. Alegria. The arguments in this case are complex and, although we determine them to be meritless, we can not characterize them as completely frivolous. Further, we can not conclude that Mr. Alegria's conduct and briefing were so beyond the pale of acceptable advocacy as to warrant sanctions against him personally. Thus, we DENY Circuit City's motion for sanctions.

## III. CONCLUSION

We AFFIRM the district court's dismissal of Lewis's claim on summary judgment.  We DENY Circuit City's motion for sanctions.